**WRIGHT TRUCKING, INC.,**
Plaintiff,

v.

**UNITED STATES** of America and the Interstate Commerce Commission,
Defendants.

Civ. A. No. 73–1445–C.

United States District Court,
D. Massachusetts.

April 3, 1975.

Leonard A. Jaskiewicz, Ira G. Megdal, Grove, Jaskiewicz & Gilliam, Washington, D. C., of counsel, Francis E. Barrett, Jr., Hingham, Mass., for plaintiff.

Kenneth Kaplan, I. C. C., Washington, D. C., James Gabriel, U. S. Atty., for defendants.

J. William Cain, Jr., and Robert S. Burk, Washington, D. C., for intervening parties, St. Johnsbury Trucking Co., Inc. and others.

## MEMORANDUM AND INTERLOCUTORY ORDER

Before CAMPBELL, Circuit Judge, CAFFREY, Chief Judge and TAURO, District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

This is an action seeking to set aside orders of the Interstate Commerce Commission denying, in large part, a joint application requesting authority for Wright Trucking, Inc. (Wright) to purchase a portion of the operating rights held by Bonded Trucking & Rigging, Inc. (Bonded). See 49 U.S.C. § 5. The rights in question are for carrying general commodities on irregular routes between Lowell, Massachusetts, and points within 10 miles thereof on the one hand, and points in southern New Hampshire and Vermont on the other.[1]

■ The ICC denied the Wright-Bonded application because it found that Bonded's operating rights had become "dormant." Dormancy is a concept the Commission developed in the course of its statutory oversight[2] of the transfer of operating rights. The underlying premise is that if a selling carrier's activity has become minimal or nonexistent, the area's shippers are presumed already to be receiving adequate service from other carriers, who will have adjusted their own operations to meet these needs. See Gregg Cartage & Storage Co. v. United States, 316 U.S. 74, 83, 62 S.Ct. 932, 86 L.Ed. 1283 (1942). A purchaser of dormant rights is seen as aggressively seeking to expand the vendor's relinquished business, C & H Transportation Co.—Purchase (Portion) —Ferguson Trucking Co., 93 M.C.C. 741 (1964), thus inciting a struggle among carriers in the area with damage either to "the public interest or to intervening or protesting carriers who conducted operations during the interruption of said services," Arrow Transp. Co. v. United States, 300 F.Supp. 813, 818 (D.R.I. 1969).

■ While dormancy is not a term found either in the statute or in Commission regulations, it is the sort of standard the Commission is authorized to adopt, having plenary responsibility for administering the national transportation policy, and for determining what factors will promote or retard the public interest. McLean Trucking Co. v. United States, 321 U.S. 67, 79–88, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

■ Still, the determination that Bonded's rights were dormant must be supported by the administrative record. The Commission's stated test for dormancy when considering irregular-route carriers like Bonded is whether

"it has rendered substantial service to a representative number of points within its authorized territory in order to support the conclusion that its op-

---

1. Certain aspects of this case are more fully described in the Memoranda accompanying our Interlocutory Orders of December 18, 1974 and February 25, 1975.

2. 49 U.S.C. § 5(2) allows operating rights to be sold and purchased, as in the present case, "with the approval and authorization of the Commission". The standard to be applied, apart from certain specifics not immediately relevant, is whether a particular transaction "will be consistent with the public interest." Id. at § 5(2)(b).

erations have been substantial and continuous."

*The New Dixie Lines, Inc.—Control—Jocie Motors Lines, Inc.*, 75 M.C.C. 659, 666 (1958). Although this formulation allows considerable administrative discretion in its application, *Miami Transportation Co. — Purchase — Richard Strothman*, 97 M.C.C. 600, 608 (1964), we have had difficulty perceiving how the Commission reached the conclusion that Bonded's rights were dormant. The data submitted with the Bonded-Wright application indicated that in the six month period prior to the execution of their sales agreement [3] it could be estimated that Bonded was handling approximately 15 shipments per day with an average daily total weight of about 30,-300 pounds.[4] Obviously Bonded was conducting some shipping operations prior to its negotiations with Wright, and it is not readily apparent that these were so *de minimis* as to require the conclusion that they were *not* "substantial and continuous."

It is apparently true that Bonded carried little traffic from much of its territory, and the statistical abstract of its operations shows but a few shipments to or from a large portion of southern Vermont. The opinion of Review Board No. 5, which originally denied the application, seems to reason that these deficiencies are enough conclusively to establish the dormancy of Bonded's rights. But the Commission has elsewhere said that evaluation of whether a given amount of shipments are substantial requires consideration of such factors as

"whether the rights involve general or specified commodities, the character of the area served in terms of industry and population, the number of carriers involved in similar service, whether the rights are radial or non-radial, and whether the financial and material capabilities of the carrier have been utilized as far as practicable."

*Miami Transportation Co., supra* at 608.

■ Here there has been no interpretive statement by the Commission explaining how, taking into account these factors, Bonded's operations were insubstantial. The only discussion at all is that of Review Board No. 5, which is at best conclusory and at worst fatally flawed by reliance upon an absence of evidence which the Commission later permitted applicants to cure. After this supplementary evidence was accepted, the Commission's Division 3, acting as an Appellate Division, purported to consider *de novo* the merits of the application. The opinion explaining its Order—which because of its *de novo* character should perhaps be regarded as the operant administrative decision for purposes of this action—recited only that Division 3 was "in general agreement with the conclusions reached regarding the issue of dormancy in the report and order of Review Board Number 5 . . . ." It may be, of course, that both Commission decisions were fully justified. However,

---

3. There continues to be a dispute over the relative weight to be assigned to data covering the period after Bonded and Wright entered into their purchase and sale agreement.

While we do not perceive any significant differences between the post-agreement data and that representing operations immediately prior to the agreement, we think the Commission would have been entitled to discount the former—at least insofar as it purported to establish that Bonded's operations had significantly increased. *See Houff Transfer, Inc. v. United States*, 291 F.Supp. 831, 835 (W.D.Va.1968); *Miami Transportation Co. —Purchase—Richard Strothman*, 97 M.C.C. 600, 604 (1964). Our review of the record is therefore limited to the data for pre-1970 operations.

4. The data submitted was in representative form, showing the shipments for the first five days of each month between June 30 and December 30, 1969. This submission, which should thus approximate 25% of all Bonded shipments for this period, showed 459 shipments with a total weight of 909,611 pounds.

without some reasoned evaluation of Bonded's shipping data, we are at a loss adequately to understand either.

In an effort to remedy this ellipsis, we compared the Bonded data with that of carriers in other Commission decisions considering the issue of dormancy, but this too left us unsure what conclusions were to be drawn. Bonded's figures appear unquestionably less "substantial" than those presented to the Commission in *New Dixie, see* 75 M.C.C. at 667, where contentions of dormancy were rejected. But they also seem to indicate significantly *more* activity than that presented in several cases where the ICC ruled that rights had become dormant. *See, e. g., Weather Bros. Transfer Co.—Purchase—Charles F. Johnson and George A. Harris,* 109 M.C.C. 528 (1970); *Red Arrow Freight Lines, Inc.—Purchase (Portion)—Galveston Truck Line Corp.,* 104 M.C.C. 820 (1968); *Pelletier Trucking Co.—Purchase (Portion)—Saw Mill Supply, Inc.,* 57 M.C.C. 115 (1950). Moreover, it appears to us that Bonded's operations were of greater magnitude than those of the vendor in *Lester C. Newton Trucking Co.—Purchase—Buglio Trucking Co.,* 101 M.C.C. 480 (1965), where the ICC found the rights had not become dormant. And in *Auclair Transportation, Inc.—Purchase (Portion)—Camel Trucking, Inc.,* No. MC–F–11552 (ICC Jan. 9, 1974), which involved the sale of the remainder of Bonded's rights not covered by the Bonded-Wright sales

agreement, the Commission approved the transfer on a showing of apparently less activity than that shown here.

In a response to this court's earlier request for a statement of position on the applicable standard of review,[5] the Commission represented that "if . . . the Court . . . finds that the Commission has failed to adequately articulate the reasons for its decisions, the Court should remand the proceeding to the Commission for further articulation. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156 [83 S.Ct. 239, 9 L.Ed.2d 207] (1962)." We think this to be an appropriate course to follow. The absence of any articulated "rational connection between the facts found and the choice made," *id.* at 168, 83 S.Ct. at 246, especially on a record which presents irritating inconsistencies and discrepancies, prevents us from performing our role in the administrative process. The Commission's ultimate decision may or may not be correct, but if our review is to serve any function we must be able to understand, at least in gross, what considerations led the Commission to conclude that Bonded's activity was so lacking in substance as to be dormant.

The order of the Commission denying the application is hereby set aside, and the matter is remanded with directions that the Commission reopen the proceedings for further consideration consistent with this opinion.

So ordered.

5. The Commission handled the Bonded-Wright application under its "modified procedure," 49 C.F.R. §§ 1100.45–1100.54, 1100.240, which does not require that an oral hearing be held; and none was on this application. Both parties take the position that modified procedure nevertheless constitutes a full and formal "hearing" within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* They argue from this that the appropriate standard of review is that prescribed by 5 U.S.C. § 706(2)(E)— whether the ICC's decision is "unsupported by substantial evidence." *Cf. Subler Trans-*

*fer, Inc. v. United States,* 396 F.Supp. 762 (S.D.Ohio, 1975). However, the language of 49 U.S.C. § 5(2) did not mandate a hearing. It is therefore an open question whether one is to be implied here, and if not, whether the Administrative Procedure Act calls for substantial evidence review. Yet the failure to explain administrative action seems to us so serious as "to frustrate effective judicial review" and warrant remand even if the less strict requirements of 5 U.S.C. § 706(2)(A) are controlling. *Cf. Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1972).